[Cite as *In re A.S.*, 2019-Ohio-4268.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

IN THE MATTER OF:                          JUDGES:
                                           Hon. William B. Hoffman, P.J
        A.S.                               Hon. Patricia A. Delaney, J.
(Neglected/Dependent Child)                Hon. Earle E. Wise, Jr., J.

                                           Case No. 2019 AP 05 0015

                                           O P I N IO N


CHARACTER OF PROCEEDINGS:        Appeal from the Tuscarawas County
                                 Court of Common Pleas, Juvenile Court
                                 Division, Case No. 18-JN-00011

JUDGMENT:                        Affirmed

DATE OF JUDGMENT ENTRY:          October 16, 2019


APPEARANCES:

For Tuscarawas County JFS              For Mother

KAREN ROSS QUINLIN                     MARIE SEIBER
389 16th Street, S.W.                  6525 Walker's Lane S.E.
New Philadelphia, Ohio  44663          Uhrichsville, Ohio  44683

Guardian ad Litem for Child            Guardian ad Litem for Mother

GERRIT DENHEIJER                       MARY WARLOP
222 West Main Street                   116 Cleveland Avenue, N.W.
Ravenna, Ohio  44266                   Suite #500
                                       Canton, Ohio  44702

*Hoffman, P.J.*

**{¶1}**   Appellant Diamond Boitnott ("Mother") appeals the April 4, 2019 Judgment Entry entered by the Tuscarawas County Court of Common Pleas, Juvenile Division, which terminated her parental rights, privileges, and responsibilities with respect to her minor child ("the Child"), and granted permanent custody of the Child to appellee Tuscarawas County Job and Family Services ("TCJFS").

STATEMENT OF THE CASE AND FACTS

**{¶2}**   Mother and Travis Soto ("Father") are the biological parents of the Child. On January 17, 2018, TCJFS filed a complaint, alleging the Child was neglected and dependent.  The complaint was based upon Parents' drug abuse, domestic violence in the home, and constant calls to the police.  Following a shelter care hearing, the trial court placed the Child in the emergency temporary custody of TCJFS.

**{¶3}**   The trial court conducted an adjudicatory hearing on March 6, 2018, and found the Child to be neglected and dependent.  TCJFS filed an amended complaint. Parents stipulated to the amended complaint.  The trial court proceeded to a disposition, and approved and adopted Mother's case plan.

**{¶4}**   Mother's case plan required her to undergo a psychological assessment. The evaluator found Mother had cognitive limitations.  As a result, the trial court appointed a guardian ad litem for Mother.

**{¶5}**   On December 13, 2018, TCJFS filed a Motion to Modify Prior Disposition, seeking permanent custody of the Child.  The trial court conducted a hearing on the motion on April 2, 2019.

**{¶6}**   Prior to taking evidence, the trial court addressed Mother:

Okay, * * * you have two choices today. One is to go ahead with your hearing, in which Job and Family Services will present their evidence to support their position on the permanent custody motion. You have a right to, of course, present anything you want to present to me and respond to their allegations in any way that you would like to legally, but I understand that you have not, uh, cooperated with Ms. Greenham, and you've put her in a bad position now * * * to help you.

{¶7} Mother responded:

. . . yeah, I didn't understand, like, at first, like, when we first talked I thought she meant, like, I misunderstand her and I thought she meant, like, basically saying that I had to sign my rights way, is what I thought she meant.

{¶8} The trial court continued:

You don't have to, but let me, let me talk to you about that a little bit. You know, Diamond, there are a lot of ways to be a good parent. Sometimes the hardest thing to do as a parent is to be unselfish and let our children be in a position where they get what they really deserve and what perhaps, as a parent, we can't give them. I have a lot of parents, um, who are in your shoes and come in and are very honest with me, and admit that

they cannot provide for their children, and that they know their children are in good care, with people who perhaps love them already and are willing to adopt 'em. And they're willing to put their own feelings aside and come in and agree to do that because they know, in their heart, that they have not provided for their children, and they can't do it in the future, and that they're in a good, safe, decent place. Now you don't have to do that, nobody has to do that, but I want you to know that, um, that is one of your options here today. And I realize it's a hard thing, I realize it requires a lot of maturity to reach that point and be able to do that for your children, but it's something that I certainly respect. Um, I'm not gonna continue this hearing today because you didn't cooperate with your lawyer, and it certainly does not put you in the best position legally, but that was kind of your own doing, you know what I mean?

* * *

So what is it you would like to do today? And, you know, I have a Guardian ad Litem report here that details, um, the fact that the case plan was not successfully completed * * *And, so, that recommendation is that, um, [the Child] be put in the permanent custody of Job and Family Services. I understand her foster parents, um, are willing to adopt her. How long has she been with them?

* * *

. . . what is it you'd like to do today?

**{¶9}** When Mother answered, "Um, I would like to fight it, if possible", the trial court asked her, "What are you gonna fight it with?

**{¶10}** Transcript of April 2, 2019 Proceeding at 5-7.

**{¶11}** Before proceeding with the hearing, the trial court ordered Mother to take a drug test. The drug test was positive for methamphetamines and amphetamines.

**{¶12}** TCJFS called Mother on cross-examination. Mother testified she has been living with her sister, her two sickly parents, her brother, and her nephew in a three bedroom apartment in Bolivar, Ohio, since January 24, 2019, when Father was arrested. Mother described how Father essentially held her hostage for three days prior to her leaving him. Mother was currently unemployed. Her last job was at McDonald's, which she quit in December, 2018, after working only a month and a half. Mother claimed Father made her quit. Prior to her job at McDonald's, Mother was employed "on and off" for about two months at Robin Industries through a temporary agency. Mother noted Father had her fired from the position. Mother dropped out of high school after 9th grade to care for her ailing mother.

**{¶13}** With respect to her case plan, Mother completed her psychological assessment with Dr. Stephen Dean between July, and August, 2018. Dr. Dean filed his report in September, 2018, and made a number of recommendations. Mother acknowledged the number one recommendation was for her to avoid further use of drugs and alcohol. Mother did not disagree with the positive drug test results. She agreed long-term therapy was recommended. She explained she attended counseling "for a little bit", but claimed Father would not allow her to go. Dr. Dean also recommended long-term parenting education. Mother attended Goodwill Parenting for a short period of time, again

blaming Father for her failure to complete the class.  In addition, Dr. Dean recommended Mother obtain and maintain full-time employment.  At the time of the hearing, Mother was waiting to hear about a factory position through a temporary agency.  She was working for her current boyfriend's tree removal company, and was being paid under the table. Dr. Dean further recommended Mother be evaluated by a physician to determine if medication would be useful in alleviating her anxiety. Mother had not yet seen a physician, but indicated she had an appointment at Community Mental Health in May, 2019.

**{¶14}** Goodwill parenting supervisor Jennifer Fire testified Mother's relationship with Father was a big concern.  Fire also had concerns about Mother's lack of stable housing and lack of employment.  Fire was unable to conduct a home visit as Mother was not enrolled in the program long enough and Mother was not stable in one location during her time in the program.  Mother was terminated from the program after the sixth week. Mother did not complete any of her twelve program goals.

**{¶15}** Elizabeth Renner, the ongoing caseworker assigned to the Child, testified the Child was removed from Parents' home due to drug concerns and domestic violence between Mother and Father.  Mother's case plan required her to maintain safe and appropriate housing, maintain income, complete psychological evaluations and follow all recommendations, complete drug and alcohol assessments, participate in parenting classes, and meet with the caseworker once a month.  The only case plan requirement Mother completed was her psychological evaluation. Renner noted the Child was doing well in her foster placement.  The Child was delayed walking and received services through Help Me Grow.  Renner added she believed granting permanent custody to TCJFS was in the Child's best interest.

{¶16} Via Judgment Entry filed April 4, 2019, the trial court terminated Mother's parental rights, privileges, and responsibilities with respect to the Child and granted permanent custody of the Child to TCJFS. The trial court found the Child could not and should not be placed with Mother, and it was in the Child's best interest to grant permanent custody to TCJFS.

{¶17} It is from this judgment entry Mother appeals, raising the following assignments of error:

I. APPELLANT'S CONSTITUTIONAL PROCEDURAL RIGHT TO A DECISION BY A NEUTRAL DECISION MAKER WAS VIOLATED, REQUIRING THAT THE DECISION BE REVERSED AND REMANDED TO A JUDGE SITTING BY ASSIGNMENT FOR FURTHER PROCEEDINGS.

II. APPELLANT'S CONSTITUTIONAL SUBSTANTIVE RIGHT AGAINST SELF-INCRIMINATION WAS VIOLATED, REQUIRING THAT THE DECISION BE REVERSED AND REMANDED TO A JUDGE SITTING BY ASSIGNMENT FOR FURTHER PROCEEDINGS.

{¶18} This case come to us on the expedited calendar and shall be considered in compliance with App. R. 11.2(C).

I.

{¶19} In her first assignment of error, Mother asserts she was not afforded adequate due process as the trial court failed to act as a neutral decision maker. We disagree.

**{¶20}** It is well established parents have a fundamental liberty interest in the care, custody and management of their children. *Santosky* v. *Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). This interest is protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and by Section 16, Article I of the Ohio Constitution. *In re Shaeffer Children*, 85 Ohio App.3d 683, 689–690, 621 N.E.2d 426 (1993). Since parents have constitutional custodial rights, any action by the state which affects this parental right must be conducted pursuant to procedures which are fundamentally fair. *Santosky,* supra*,* 455 U.S. at 754, 102 S.Ct. 1388, 71 L.Ed.2d 599; *In re Adoption of Mays*, 30 Ohio App.3d 195, 198, 30 OBR 338, 507 N.E.2d 453 (1986).

**{¶21}** Mother's argument focuses on the statements the trial court made to her prior to the start of the hearing. Mother asserts the trial court's message was clear: "A good parent lets children be adopted when someone else can better provide for them and are honest about their inability to provide them. A lot of parents are unselfish and admit that they can't give their kids what they deserve. Only a mature person can do that. If you don't do [sic] agree to give her up, you are immature, selfish and dishonest." Brief of Appellant at 8. Mother adds, when she stated she wanted to fight and continue with the hearing, the trial court "doubled down" and questioned how Mother planned to fight. Mother concludes the trial court had prejudged the case and "permanent custody [was] so CLEARLY the outcome." *Id.* at 9.

**{¶22}** We note the general presumption under Ohio law that a judge is fair and impartial. See, *State v. Dennison,* 10th Dist. Franklin No. 12AP–718, 2013–Ohio–5535, ¶ 49. Judicial bias has been described as "a hostile feeling or spirit of ill will or undue

friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts." *State v. Dean,* 127 Ohio St.3d 140, 2010–Ohio–5070, 937 N.E.2d 97, ¶ 48, (Citation omitted).  If a trial judge forms an opinion based on facts introduced or events occurring during the course of the current or prior proceedings, this does not rise to the level of judicial bias, unless the opinions display a deep-seated favoritism or antagonism that would make fair judgment impossible. *State v. Hough,* 8th Dist. Cuyahoga Nos. 98480, 98482, 990 N.E.2d 653, 2013–Ohio–1543, ¶ 11 (Internal citations omitted).

**{¶23}** We find Mother failed to demonstrate the trial court was not fair and impartial.  While the trial court clearly explained Mother's option to agree to a grant of permanent custody to TCJFS, it just as clearly advised her she did not have to do so. The matter had been pending over fourteen months prior to the permanent custody hearing, and the trial court had presided over all aspects of the case and was well-versed in the matter.  There is insufficient evidence to support the conclusion the trial court prejudged the case.

**{¶24}**  Mother's first assignment of error is overruled.

II.

**{¶25}**  In her second assignment of error, Mother contends the trial court violated her rights under the Fifth Amendment when it permitted TCJFS to call her as a witness on cross-examination.

**{¶26}** The Fifth Amendment to the United States Constitution provides, in pertinent part: "No person * * * shall be compelled in any criminal case to be a witness against himself.

**{¶27}** The Fifth Amendment applies in both criminal and civil proceedings. *In re Shrider,* 3d Dist. No. 16-05-20, 2006-Ohio-2792, ¶ 33, citing *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.E.2d 274 (1973); *Tedeschi v. Grover*, 39 Ohio App.3d 109, 110, 529 N.E.2d 480 (1988). In a criminal proceeding, the Fifth Amendment permits a criminal defendant to completely refuse to testify. *Id.* By contrast, in a civil proceeding, the Fifth Amendment prohibits the state from compelling a witness to testify regarding a matter that "may tend to incriminate" the witness in a future criminal proceeding. "Compulsion, in this sense, arises whenever some penalty * * * is imposed for failing to offer testimony." *Id.*

**{¶28}** The Fifth Amendment protection against self-incrimination did not permit Mother to *completely* refuse to testify. See, *Shrider*, supra at ¶ 34. A review of Mother's testimony establishes the trial court did not, at any time, compel her to answer any questions. Furthermore, Mother was not asked a single question or make a statement which would incriminate her in a subsequent criminal proceeding. Mother has failed to cite this Court to any question she was asked which would have called for an inculpatory answer. We find her claim she was denied her Fifth Amendment right against self-incrimination is unsubstantiated.

**{¶29}** Based upon the foregoing, we find the trial court did not violate Mother's Fifth Amendment right against self-incrimination.

**{¶30}**  Mother's second assignment of error is overruled.

**{¶31}**  The judgment of the Tuscarawas County Court of Common Plea, Juvenile Division, is affirmed.

By: Hoffman, P.J.

Delaney, J.  and

Wise, Earle, J. concur